The first case this morning is 5-23-0207 Romero v. Levold. Arguing for the appellant is Ruth Wyman. Arguing for the appellee is Ann Martinkus. Each side will have 15 minutes for their argument. The appellant will also have 5 minutes for rebuttal. Please note only the clerk is permitted to record these proceedings. Good morning, counsel. Good morning, judges. Ms. Wyman, are you ready to proceed? I am, thank you. Then go right ahead. Thank you. May it please the court and counsel, my name is Ruth Wyman and I represent John Barlow Levold, the respondent appellant in this case. This case starts with the remand from the 4th District when it ruled in 2021 ILAP 4200326-U in stating and finding, having concluded the court should have classified the rental income as marital property, we find the matter must be remanded for the court to vacate its award of $20,000 credit to petitioner for her payment of the party's marital debt with the rental income and for the court to determine either through a stipulation of the party's or limited evidentiary hearing the net income realized from 409 Irvine and whether any of that income was used to pay for marital expenses. After doing the above, the court should issue a new equitable division of marital property. The court did in fact hold an evidentiary hearing but it did not make and it abused its discretion when in its ruling it determined or essentially didn't measure the division of assets as it should be and then heard a new issue that had never been brought up in the first appeal and made a ruling and incorporated that into its case. Finally, when the respondent appellant who I'll refer to as Barlow, when he filed a motion to reconsider the court had already sent the case onto a family law court to be ruled on and the judge took the case back and unilaterally then decided to rule on the issue on the request to reconsider without allowing its prior ruling to send this to family court to be decided. The first issue I want to address is the issue of the abuse of discretion in calculating the additional contributions, labor and improvements and also the ad valorem costs and payments that were made and so that goes to the division of the marital asset which is the rental business and that income that was received. The information and the proposed division of marital property that we provided which is on page C-283 of the record and I think it was misstated in the appellant brief but I wanted to just that and that includes several or the basic information but just to look over the net income that was realized for 409 Irvine which was the Romero's non-marital property, property she had owned prior to marriage. The parties lived there and then took out a loan on that property then purchased the marital home on Trout Valley where they lived. So just as the background, parties had two rental properties that they purchased during the marriage and then used 409 Irvine when they moved to Trout Valley. They used that as a rented that out and both parties participated in the rental of that property but as noted in the record and in the evidence, the there was a small mortgage on the Irvine property when the parties moved out of that property and moved into Trout Valley property and they took out another mortgage but there were substantial amounts of debts that were paid of marital property or from marital, sorry, marital assets that paid for the debts on Lisa Romero's non-marital property of 409 Irvine. That property, I would just note that the evidence showed and the testimony from Lisa Romero showed that while Lisa handled the financial issues and Barlow handled the other issues, the sort of the repair work, those sorts of things, Lisa really used all of the accounts and mixed those and then reimbursed herself for those. She deposited funds from other accounts into what she had labeled and called a 409 Irvine rental account but really included funds from other accounts. When there was not enough money in the 409 Irvine rental account, for example, she would transfer funds into other accounts to cover bills and then deposits also included that were put into the 409 Irvine, included money transferred from the accounts that Barlow had used. She would easily just move those funds around without much care for or concern for whose accounts, whether those were Barlow's personal accounts, Romero's accounts, any of the two marital rental properties on Natalie Drive or the rental business at 409 Irvine, which wouldn't be an issue until the parties get divorced and then we have to determine what is the division of marital assets and debts, which was the mandate from the Fourth District in determining what that division should be. So there were funds that were transferred between the different condo rental accounts and Lisa admitted in testimony that she wasn't sure what all of them were for. When there wasn't enough money in one account to pay taxes, Barlow paid money and put that into the account and those would be then paid. Lisa testified that she had reimbursed herself for repairs that she made to 409 Irvine and she also transferred funds to pay condo fees, which is one of the ad valorem expenses that an owner should be paying as opposed to a rental business paying. So there's substantial issues with regard to the amount of taxes that were paid for the 409 Irvine rental business, those totaling $34,367.01 and condo expenses, which are also an ad valorem expense, $9,400 during the term of the rental business. We have additionally other expenses that were paid. Barlow testified and the evidence showed that he had made substantial, not just done substantial repairs, but paid money for these repairs to Lisa's non-marital property, which again wasn't something that the parties kept so much concern over, although I think it was surprising to Barlow to find out at testimony that Lisa had just moved money all around because she was the one who was in charge of the finances. But when one gets divorced, then all of a sudden this information comes to light and she disclosed in fact that those monies had been all moved around. The court obviously and I think admitted that that $20,000 transfer was a mistake, but the trial court also erred and abused its discretion in not considering and not accounting for the ad valorem and other additional expenses. So we have a total and it's listed on page C-283 in the chart that's included in the motion to reconsider, but this is a total of $55,238, which should have been transferred over to Barlow's side for that division of assets from the rental business, which the 4th District Court ruled was in fact a marital business, though 409 Irvine was Lisa's non-marital property. But those taxes and those condo fees as well as the repair work can be traced and should be credited to Barlow-Romeau, the respondent appellant. The other thing that the court should note and which is raised also in the motions was raised at every level in the trial court before the 4th District and in the 4th District and then again on remand and here is calculating in the division of marital assets that loss of income because Romero refused to lease 409 Irvine. Again, when something is considered a non-marital asset, that person can decide what to do with it, that's his or her loss. In this case though, with the 4th District determining that the business, the rental business was a marital business, Romero's decision and refusal to continue to rent out the property caused a loss of around $11,000 from refusing to rent out the property while she listed it for sale. And so those, it was $11,250 was one half of the rent that would have been received had Romero rented 409 Irvine instead of taking it off the market. And again, when that's a non-marital, when the business was determined a non-marital asset as the trial court originally did, that's Romero's choice to not have that money but the record shows that she continued to transfer money from Barlow's account, from the other rental accounts into the 409 Irvine account to pay for the various expenses that continue on with a rental business and that you can't pay for when you don't have someone renting that property. So we've included that and calculated a total of $55,238 that's owed to Barlow-LeVault for that. And then the chart on C-283 shows that equitable division or proposed equitable division that includes consideration as well with additional debt that LeVault left of $88,000 in student loan debt and the additional value that Romero received in the increased value of 409 Irvine when it was sold because of the improvements. And so we're asking that that $55,238 be attributed to LeVault. Then another issue or the second major issue is this idea of trying to transfer or get credit for $28,033 when the issue was never raised in the appellate court in the fourth district and now for the first time on remand and actually less than two weeks before we have the hearing required on remand, $28,033 to Romero. I would note on a couple issues, and this is raised in paragraph B on page 17 of our brief, the court I think originally had said, well, we're only going to Then Romero brings up this issue in claiming in her motion that she's owed $28,033 and that that wasn't attributed. And that was the motion to correct courts property allocation filed October 18, 2022 and starting at page C-260. Again, this was an issue brought up less than two weeks before the hearing on remand. I don't know, a year, two years after, I guess a substantial amount of time after the fourth district ruled and again, never brought up in the original appeal. I bring this up as less than two weeks because under Champaign County and six judicial circuit rules, one is required to file any pleading and give two weeks notice or sorry, file any motion and give two weeks notice for any hearing on the matter. And that wasn't done. It was sort of like, oh, let's bring this issue up. That's not appropriate. And again, it is not an issue that the court has, that the trial court had authority to rule on because that wasn't a part of what was part of any part of the remand. And again, it wasn't properly before the trial court, the trial court still ruled on that issue anyway. And so we're asking that because that issue, we believe had already been addressed in the fourth district case that this money not be addressed or if the court feels that somehow it wasn't addressed, we're asking that that issue be remanded as well so that Barlow can file a response to the motion to correct courts property allocation. And then allow us to argue that issue in front of the trial court. Finally, we note, and that's the third issue on page 18 of our brief, is that when the trial court made its ruling on the issue of after the arguments were filed in the remand, we filed a motion to reconsider. And that the issue or the trial court when it made its ruling said from now on all issues are going to be in front of the family court because the judge who ruled on that matter is now head of criminal court. And so he sent that to the family law court. We filed our motion to reconsider and the judge, Judge Rosenbaum, who had ruled on this and sent this over to family law court, then unilaterally just took that case back and denied any motion, denied any hearing, though it had been set for hearing, denied us the right to have a hearing and to argue that issue and ruled again without a hearing on that motion to reconsider. We're asking that the court reverse and remand the trial court's ruling with specific direction granting levels 55,238 as and for the equitable division of marital assets, reverse the court's ruling regarding the $28,033 and what other further relief this court deems just and appropriate. Thank you. Thank you, Ms. Wyman. Before we move on, Justice Vaughn or Justice Barberis, do you have any questions at this point? I have a question that the judgment was entered on November 23rd, 2022. On December 21st, there was an agreed order extending time to file a motion extending to January 23rd. But by January 23rd, nothing was filed. You filed your another agreed motion to extend on January 24th, but the court's jurisdiction had already ended on January 23rd when the first motion to extend agreed order to extend expired. So how does this court even have jurisdiction? You eventually filed a motion on February 22nd, but the trial court's jurisdiction appears to me ended on January 23rd by the first agreed order. Your Honor, my recollection is that parties had agreed, but I think the court was not available. I'm trying to look at that. And so the parties had agreed that the court would have that jurisdiction and revested that jurisdiction. That's my recollection of the situation or of the case and that the parties had agreed to that. And that the court, by entering that extension, had agreed. I think there were some various illnesses either with the court or with the parties or counsel. I can't recall exactly how that worked. Let me try and look at this. That's my recollection, Your Honor, is that, yeah, the second agreed order that's what the parties had agreed previously. And there was a delay just because I think Judge Rosenbaum may have been out. But that was my recollection of how the proceedings and so revested the jurisdiction. Okay, thank you. Thank you. Are the parties, the parties have the power by agreement or otherwise to reinvest the court with jurisdiction? I think, I don't know that the parties do, but I believe the judge does, the trial judge does. How does the trial judge have jurisdiction to issue a party grant any motion if it's lost jurisdiction? I don't have that answer, Your Honor. I would ask for leave to be able to provide that information in writing if the court wishes. You may do so, but I have the answer. The answer is it doesn't. So I'm not sure that we're not wasting our time today if there's no jurisdiction even here in this case. But if what you're saying is that you were intending to file that order somehow because of the court's unavailability, I'm not sure if there's still remedy for that. But I think as Justice Vaughn said, I'm not sure that we have jurisdiction here in this case. But be that as it may, it's not my call right now. So that's the only thing I wanted to bring up. Okay, thank you. Thank you, Justice. Obviously, Ms. Wyman, you'll have your time for rebuttal. Ms. Martinkus, go right ahead. Good morning. May it please the court and counsel, I'm Anne Martinkus, and I represent the respondent, Lisa Romero. May we ask you to just address the jurisdictional issue right off the bat? Just give us your opinion. Yes, I will. I was unaware exactly of that mistake. So I don't believe that the court, any court, the trial court can reinvest jurisdiction once jurisdiction is lost. It's not something that can be gained by counsel. Clearly, from an honesty standpoint, I allowed Ms. Wyman to have the extra time and I didn't know that there was a day or so between that when the court entered the order and she filed a brief. And if that's the case, when the court has lost jurisdiction, then it cannot be reinvested. I'm not sure about the dunk-o-tunk, but it certainly was my position to allow her to have time to file, additional time to file. So I just want to be upfront with that. No, we appreciate the honesty on that. Do you recall, just for my own purposes, do you recall was that agreement made prior to the day the order was filed, or was it on the day the order was filed? No, it was prior. Okay. Yes. So that was certainly my intention was to give her additional time to file her brief. So in this case, there really are, when I looked at the Tishner's or Pellant's brief, I really broke it down into five issues. So the first issue is what was the, rent from 409 Irvine. And I outlined in my brief, and I think council and I both agreed that the rent, the rental income was around $88,000. This is a property that is a non-marital property. Both parties, the court has found it's non-marital and the appellant didn't contest that this is a non-marital property. So the income from that property was marital income or non-marital income. And the appellate court held that it was marital income. But where I have issue with the appellant's argument is as follows. One is the appellate court mandate provided that it be net income. And we would look at net income in all aspects from the tax code. And also, as I pointed out in my brief from 505, which is the child support guidelines, we mean income after payment of reasonable and necessary expenses. And where my client disagrees with the appellant is those expenses, which I outlined in my brief. And I will say this, we had a lengthy hearing where we went statement by statement looking at what was paid for homeowners insurance, for condo association fees, for electricity or any other expenses, and real estate taxes, repairs. All of those expenses are expenses necessary to maintain the rental income that is deemed to be marital by the appellate court. And so where I have issue with the argument is you must first consider what expenses were necessary to maintain the rental property so that it can be rented. Because if counsel argument would indicate that somehow this benefited my client, what it really benefited was the marital estate because they received rent. And I gleaned these numbers from the massive pages of the record where we went statement by statement. And if you look at the necessary expenses, they were about $48,000. And in those expenses in my brief, I included the condo fees, insurance, power, property taxes, sanitary and water as expenses necessary for the production of income. So you, I think, first have to arrive at what is the net income. And I think that's what the appellate court wanted us to do. Was there any inclusion in that hearing, that lengthy hearing you referred to in your brief with regard to the efforts by Mr. LaVold in maintaining the property or repairs to the property and expenses that were used to buy materials for those repairs? Yes, Judge. At the initial hearing, Mr. Barlow did not have any documentation or receipts as to what he had done. This property had been rented during the course of the marriage for about 12 years. The parties have lived in the property prior to purchasing the marital residence. And the court found that if you look at the trial court's initial memorandum, it was already taken up that those expenses were not substantial in nature. Those, what I'm referring to though, and correct me if I'm wrong, I may be, the evidentiary hearing that you're talking about that was a lengthy one in nature, that was post remand, correct? The evidentiary hearing was prior to, we had two evidentiary hearings, the main evidentiary hearing, and then that was not even an issue that was appealed, was those expenses that were related to Barlow, if I'm recalling. It's been a while. I did read the appeal, but the trial court found that those weren't substantial in nature, because really, you need to make repairs and things to maintain the rental property to be able to rent that property. Right, and the water bill might only be $40 that month, that's not substantial, but you need to have water every month to keep it rentable as well. Right. What I'm asking, I know he then was able to give some numbers based on a review of the Home Depot, or Menard's receipts over the year, I guess his account at Menard's, he was able to piece something together, did that occur post remand? Yes, that was post remand. The court allowed him to come in and produce what the costs, he only could produce the cost today, what it would have been at the time of the hearing, rather than what it was over the course of those 12 years. He didn't have records kept for 12 years of repairs, and they were not substantial in nature, like putting in a new water heater, or putting in a new air conditioning, or a new roof, and he really couldn't even substantiate what repairs he made. I believe, and I could be wrong, Justice, that he had only come up with his labor at the time of the initial hearing. I think he had suggested $40 an hour was standard for a handyman in the area at that time, but I was just curious, and the court didn't find that substantial? No. In the initial hearing, was that brought up again? It was brought up again, which I objected to, because I believed it was beyond the mandate of the court, and reimbursement for those expenses had already been litigated in the initial hearing, those expenses had been already litigated, and that was not appealed, and the trial court had found that those were not substantial in nature, because really, what's confusing in my mind is we have a non-marital asset, but we're getting non-marital income, or marital income from a non-marital asset, so it's kind of mixed up, because if you don't make the repairs, then you can't rent the property, but again, the court found that they were not substantial in nature, and he could not produce, you know, I repaired the sink at this time, or I repaired the toilet at this time, and most of the repairs that he referred to were just general upkeep, you know, the tenant calls, this isn't working, but those were not substantial in nature, and where I think that would come into play is if those repairs were non-marital property, and that's where I think that analysis comes in, is if the repairs were substantial, and his personal effort was substantial, then he could make a claim that those repairs and his personal effort increased the value of the non-marital asset, and that was not a claim that he made, there was no evidence that his personal effort increased the value of the marital residence. Now, the income that was generated was marital, so the question becomes, what was the income used for, and if he thought it was for a non-marital purpose at the time the marriage was breaking down, then he could have filed a claim of dissipation, which he the income, so if he did repairs, he received the benefit of that income as marital income, and then that he could use to make expenditures, and that's what happened, they had the net proceeds were used to pay the mortgage that they had on 409 Irving, which they used to purchase the non-marital residence, and so the net proceeds after we deducted, and I didn't even deduct for any repairs because there was the only issue he could show was personal effort, but the total net income was $39,000 after making, paying the condo fees, the taxes, and all those expenses, and if there were repairs, my position or my client's position would be that those were necessary to me so that they could actually use the rental income, and they did, they used 40, about $40,000 of the rental income to pay down the debt that was used to purchase the marital residence, so he clearly had the benefit of the rental income, and so after you do that, and you look in my brief, I came up with maybe a negative $1,000 or $2,000, now that didn't include repairs because no evidence was presented, this is what I paid 10 years ago to fix the sink, or what I paid 12 years ago to paint it or put new carpeting in, the general expenses that you would have, and there was absolutely no evidence as to the value that his personal efforts, how that appreciated the non, the non-marital estate, so from that standpoint, I, my position is, now granted, the trial court did not go through the same analysis that I did in my brief, but certainly there was a vast amount of evidence heard in, on that issue, and the mandate from the appellate court was only to consider the net income, and he got a second bite of the apple that he had in the previous hearing to address, this is the same claim that he made at the previous hearing about his, all of these repairs that he made and everything, at the initial hearing he made at this hearing, which I objected to because that had already been decided, and second of all, I think, the only other issue I had, which was, I filed the motion to correct, what happened there was, my client was allocated $28,000 and the court could not effectuate that order because that my client could not receive $28,000 that the court allocated because it had already been distributed to Barlow, and counsel is correct, I did not give the 14 days notice, but I still think that's, you know, not an error that would result in this being an abuse of discretion, but this $55,000, and apparently, the other issue was the student loan, which never came into play at any of, any, the initial hearing or anything, nothing came into play with that student loan, so I have no idea where that's coming from, and that wasn't even addressed by the mandate from the appellate court was the student loan, that, that, all that was issued was, is what did we income, that was the mandate from the appellate court, and I don't know what would happen if you find that he spent money for a non, my client spent money for a non-marital purpose because there was never a claim of dissipation that was filed, so that's also comes into play, is what happens if there was a non-marital, and what she did with the other expenses, and, you know, too, if he used marital income to pay for some of these expenses, it's generating marital income to the parties, and second of all, you know, if you have a claim of reimbursement, it could be deemed to just be a gift to the marriage, which I never raised, so I, I think the issue with the trial court level is he didn't, the trial court didn't really go back and try and figure out, as he said, he's, which he was right, the trial court was right, there was about $40,000 left that was used to pay on the non-marital, or on the marital debt, so with that, I think the appellate court, or the trial court should be upheld, I'm not sure what would result from another hearing on this issue that we haven't already tried in the initial hearing, and I think, I, again, I'm, I know my time's up, but I, the appellate court recognized that it was a lengthy hearing, and all of this information that I gathered couldn't be gleaned from the record. Thank you, Justices, and thank you, Thank you. Regarding that issue about the 14 days of filing the motion, and, and local rule of whatnot, was there an objection, or was that brought up to the trial court, to, to rule on whether or not it was timely, and if it was going to consider it? Obviously, it did consider it. It did consider it, and, you know, Judge, to be honest, my recollection, I know it was brought up in counsel's motion to reconsider. That's my recollection. Yeah, I can understand it, so there's a lot going on in this case, and, and it sounds like you all were, at least from what I can read in here, working well together, so to speak, and giving each other professional courtesies, but that was my question, is whether that was brought up to the trial court's attention. Um, Ms. Wyman may have a better memory than I do. I, I know it was brought up in the motion to reconsider. Okay, well, thank you, counsel. Um, before we move back to Ms. Wyman, Ms. Wyman, I'm sorry, um, Justice Vaughn or Justice Barberis, do you have any questions? No other questions. I do not, thank you. Okay, well, again, thank you, counsel. Ms. Wyman, go right ahead with your rebuttal. Thank you. May it please the court and counsel, um, I appreciate Ms. Martinkus' recollections with regard to the filing in the record. I did go back through emails, um, and noted that, um, to the extent it matters to the court, um, the email from Judge Rosenbaum emailing Ms. Martinkus and I directly the, um, the agreed order for extension of time was emailed from him on January 24, I think in the morning, um, to me that suggests that it was something that was emailed to him as, as we would have practice of doing rather than going through the e-file system, um, because there were issues with the circuit clerk at the time, uh, sent the email, uh, the proposed order that was signed by the parties or signed by counsel, um, and submitted to him. And then my impression is, is that he then signed it that morning after coming into court and finishing his, um, his duties on the, um, in criminal court or first appearances, that sort of thing, and then emailed to Ms. Martinkus and I directly the order extending time. Um, but my recollection is similar to that of Ms. Martinkus, where we had come to an agreement in advance, um, then, uh, got, got it signed off on and submitted it to the court, uh, for that. Um, with regard to the, the question you asked me- Do you have a, a send date of when one of you sent the, uh, the motion to the court? Sorry, I was looking for that. I don't see that. Um, and so I, so the short answer is I don't see that. It, my recollection of our, and the common practice with Ms. Martinkus and frankly with other attorneys is we submit it, um, and, uh, the other side signs it and either submits it or sends it back. And then, um, at that time, and frankly now still with some issues with, uh, the circuit clerk remembering to, or being able to get to all of the things, we all, we would send it directly to the judge or to the judge's clerk, um, for entry of that order. I do not see a send date, um, uh, for that. And so I don't know if that means that Ms. Martinkus or her clerk, uh, her assistant filed it or if, um, one of my assistants filed it. And so then it's not in my email queue and I, I need to ask, uh, one of them if they forwarded it to, to the judge. So I, I do not have that. I just have the judge replying back, um, or forwarding it to us that he had signed it that morning of Tuesday, January 24th, 2023. Um, thank you. I appreciate it. So, um, with regard to, uh, that issue of bringing, um, uh, objecting or bringing up the, um, this 14 day, uh, uh, or not, not giving 14 days, um, I'm looking at the report of proceedings, um, from that day and, uh, I'm looking, um, uh, I know we had brought up some issues and, um, uh, I think that the court, so I can't find it so quickly, but I think that the court had said we're only dealing with the issues on remand. Um, and since this, uh, new issue that Ms. Martinkus had filed on the motion to correct the court's property allocation, um, wasn't, um, part of that issue of remand, I don't remember specifically saying, judge, we can't, we're not supposed to deal with it because it seemed, my recollection is it seemed pretty clear. Okay. We weren't going to deal with that. We would have to deal with that another time. And then when the court in its ruling, um, after the remand hearing, um, included the issue of the $28,033, uh, from their motion to correct, that's when we then brought it up in our motion to reconsider saying, hey, that wasn't something that was supposed to be addressed, um, uh, by the court and we didn't have an opportunity to do that. So I think it's a similar issue, similar response to what Ms. Martinkus had advised. Um, but I just wanted to bring that up on the issue of the student loan. Um, I just note that because that, um, although I think the trial court did not mention specifically in its equitable division, um, the Mr. Barlow's, uh, student loan, that was something that, that debt that was, um, clearly there that we're not suggesting that's a marital debt. It was, um, Barlow's non-marital debt, but in an equitable division of assets where I think our, um, uh, the, um, proposed, uh, um, division that, that, uh, we had made, I think was maybe $5,000 off of each side. Um, it makes sense, I think, to, to consider that amount, an extra $88,000 that my client had in non-marital debts, as well as the additional, um, increased, um, value of 409 Irvine, uh, Lisa Romero's non-marital, um, non-marital asset, as well as the, um, the court granting her the Trout Valley property, which was, um, the marital residence that the parties purchased. Thank you. Well, thank you, counsel. Um, before we let counsel go for the day, Justice Barbaros or Justice Vaughn, do you have any final questions? I do not. No other questions. Thank you. All right. Well, thank you, counsel. Um, obviously, we'll take the matter under advisement and we will issue an order in due course.